UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES

- v. -

TAIJAY TODD,

               Defendant.

12 Cr. 45 (RJS)

**MEMORANDUM OF THE UNITED STATES IN OPPOSITION
TO DEFENDANT TAIJAY TODD'S MOTION FOR BAIL
PENDING APPEAL**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Michael D. Maimin
Assistant United States Attorney
      -Of Counsel-

# TABLE OF CONTENTS

I.    Preliminary Statement .................................................................... 1

II.   Background ...................................................................................... 2

      A.    Todd's Criminal Activities, Plea, Sentence, and Continued
            Pattern of Violence ............................................................... 2

      B.    This Court Resentences Todd to the Statutory Maximum of 20
            Years' Imprisonment .............................................................. 3

      C.    Todd's Health Conditions ....................................................... 7

      D.    The BOP and COVID-19 ......................................................... 9

III.  Argument ....................................................................................... 14

      A.    Applicable Law .................................................................... 14

      B.    Discussion .......................................................................... 17

            1.    Todd Cannot Demonstrate, by Clear and Convincing
                  Evidence, That He "Is Not Likely To … Pose a Danger to
                  the Safety of Any Other Person or the Community if
                  Released" ...................................................................... 18

            2.    Todd Cannot Demonstrate, by Clear and Convincing
                  Evidence, That He "Is Not Likely to Flee … if Released" .......... 19

            3.    Todd's Appeal Does Not "Raise[] a Substantial Question Of
                  Law or Fact" ................................................................. 21

            4.    Todd's Appeal Is Not Likely to Result in Either "Reversal,"
                  "a Sentence That Does Not Include a Term of
                  Imprisonment," or "a Reduced Sentence to a Term of
                  Imprisonment Less Than the Total of the Time Already
                  Served Plus The Expected Duration of the Appeal Process"
                  ................................................................................... 24

            5.    Todd Cannot "Clearly Show[] That There Are Exceptional
                  Reasons Why [His] Detention Would Not Be Appropriate" ....... 26

IV.   Conclusion ..................................................................................... 28

## Table of Authorities

Page(s)

Cases

*Baldwin v. United States,*
778 F. App'x 42 (2d Cir. 2019) ................................................................................ 25

*United States v. Abuhamra,*
389 F.3d 309 (2d Cir. 2004) .................................................................................... 15

*United States v. Broxmeyer,*
699 F.3d 265 (2d Cir. 2020) .................................................................................... 22

*United States v. Cavera,*
550 F.3d 180 (2d Cir. 2008) .................................................................................... 22

*United States v. Davis,*
139 S. Ct. 2319 (2019) ................................................................................... passim

*United States v. DiSomma,*
951 F.2d 494 (2d Cir. 1991) .................................................................................... 16

*United States v. Dore,*
586 F. App'x 42 (2d Cir. 2014) ................................................................................. 3

*United States v. Giancola,*
754 F.2d 898 (11th Cir. 1985) ................................................................... 21, 22, 23

*United States v. Handy,*
753 F.2d 1489 (9th Cir. 1985) ................................................................................. 23

*United States v. Krilich,*
178 F.3d 859 (7th Cir. 1999) .................................................................................... 21

*United States v. LaGiglio,*
384 F.3d 925 (7th Cir. 2004) .................................................................................... 21

*United States v. Lea,*
360 F.3d 401 (2d Cir. 2004) .................................................................................... 16

*United States v. Manson,*
788 F. App'x 30 (2d Cir. 2019) ................................................................................ 21

*United States v. McDowell*, — F. App'x —, Docket No. 19-899,
  2020 WL 1228766 (2d Cir. Mar. 13, 2020) ........................................................... 25

*United States v. Miller*,
  753 F.2d 19 (3d Cir. 1985) ............................................................. 14, 22, 23

*United States v. Newman*,
  No. 12 Cr. 121 (RJS), 2013 WL 1943342 (S.D.N.Y. May 7, 2013) ........................ 22

*United States v. Randell*,
  761 F.2d 122 (2d Cir. 1985) ................................................................. 21, 22, 23, 25

*United States v. Valente*,
  915 F.3d 916 (2d Cir. 2019) ................................................................................. 25

*United States v. Watkins*,
  940 F.3d 152 (2d Cir. 2019) ................................................................................. 16

Statutes

18 U.S.C. § 2 .................................................................................................................. 3

18 U.S.C. § 924(c) ......................................................................................................... 3

18 U.S.C. § 1951 ............................................................................................................ 2

18 U.S.C. § 3142(b)(1) ...................................................................................... 1, 16, 17

18 U.S.C. § 3143(b) ............................................................................... 1, 15, 16, 27, 24

18 U.S.C. § 3145(c) ............................................................................................ 1, 16, 17

18 U.S.C. § 3156(a)(4)(B) ........................................................................................... 16

18 U.S.C. § 3553 ............................................................................................................ 4

18 U.S.C. § 3142(f)(1) ................................................................................................. 15

Other Authorities

Hon. Jon O. Newman, *Decretal Language: Last Words of An Appellate
  Opinion*, 70 Brook. L. Rev. 727 (2005) ........................................................... 24, 25

## I.    Preliminary Statement

The Government respectfully submits this memorandum in opposition to defendant Taijay Todd's Emergency Motion for Bail Pending Appeal (the "Motion"). (Docket Entry 640).

This Court should not grant Todd's Motion. Todd does not, and cannot, qualify for the truly extraordinary remedy of bail pending appeal for a number of reasons, any one of which would be a sufficient basis, under the statutory scheme, to deny bail:

(1)    he cannot demonstrate, by clear and convincing evidence, that he "is not likely to … pose a danger to the safety of any other person or the community if released," 18 U.S.C. § 3142(b)(1)(A);

(2)    he cannot demonstrate, by clear and convincing evidence, that he "is not likely to flee … if released," 18 U.S.C. § 3142(b)(1)(A);

(3)    his appeal does not "raise[] a substantial question of law or fact," 18 U.S.C. § 3142(b)(1)(B);

(4)    his appeal is not likely to result in either "reversal," "a sentence that does not include a term of imprisonment" or "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process," 18 U.S.C. § 3142(b)(1)(B)(iii)&(iv);

(5)    he cannot "clearly show[] that there are exceptional reasons why [his] detention would not be appropriate," 18 U.S.C. § 3145(c).

In particular, this Court resentenced Todd to 20 years' imprisonment, a sentence below that previously affirmed by the Second Circuit, after he demonstrated conclusively that such restrictions as federal supervised release and prison were inadequate to alleviate danger to others who he assaulted, robbed, and murdered, and he now

claims exceptional circumstances by virtue of the fact that he had a distant history of asthma—while housed at a facility that appears to have contained COVID-19—which condition apparently did not bother him until it became convenient for the purpose of seeking bail from this Court. If the Court were to grant bail to Todd, it is hard to conceive of the inmate who should not be set free. That is not the law, and that makes no sense.

## II.   Background

### A.   Todd's Criminal Activities, Plea, Sentence, and Continued Pattern of Violence

While on supervised release for a prior federal drug felony, Todd began to commit robberies with an incredibly violent robbery crew that targeted civilians "who were simply trying to go about their business" (Tr. 41)[1]—typically immigrants or others perceived as particularly vulnerable members of society—stealing money and goods at the threat—often acted upon—of violence through fists, bats, knives, and guns.[2] Among other things, this robbery crew—and Todd himself—participated in the murder of Gamar Dafalla.[3] Todd pleaded guilty to one count of participating in a Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951, and one count of using

---

[1] "Tr." refers to the February 25, 2020, resentencing transcript in this case.

[2] Todd's deeply troubling criminal history is set forth in detail in the Government's resentencing submission in this case. (Docket Entry 622 at 2–21).

[3] This Court found, by a preponderance of the evidence, that Todd participated the Dafalla robbery/murder, although it chose not to incorporate that robbery/murder into Todd's guidelines. (Docket Entry 621 at 27).

and carrying firearms during and in relation to, and possessing firearms in further-ance of, that Hobbs Act robbery conspiracy, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2. This Court sentenced Todd to 22 years' imprisonment, an above-Guidelines sentence that the Second Circuit upheld as pro-cedurally reasonable. *United States v. Dore*, 586 F. App'x 42, 44–45 (2d Cir. 2014). On appeal, Todd did not challenge the substantive reasonableness of his 22-year prison sentence.

Todd's arrest only shifted the locus of Todd's pattern of violence from the streets to the jailhouse. Todd, who had been involved in seven separate incidents in-volving violence or weapons while incarcerated on his earlier drug offense (Docket Entry 622 at 21 n.14), was involved in 14 incidents involving violence and/or weapons from 2012 through 2019, including stabbing Edward Ramirez for being a "rat" while awaiting sentencing (Docket Entry 622 at 11–13, 20–21).

### B.   This Court Resentences Todd to the Statutory Maximum of 20 Years' Imprisonment

In light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), a Hobbs Act robbery conspiracy was no longer considered to be a "crime of violence" upon which a Section 924(c) conviction: a hyper-technical distinction that elided the facts of Todd's case. (Tr. 4 (This Court, explaining, in this case, that "[t]he Supreme Court takes an approach that says if it's possible to commit this crime with-out engaging in violence, then it's not a crime of violence, even if in the particulars of this case there was clearly violence.")). Accordingly, the parties agreed that this Court was bound to vacate Todd's Section 924(c) conviction and resentence him on the

Hobbs Act robbery conspiracy conviction, on which this Court could give Todd no more than 20 years' imprisonment.

At the resentencing, Todd faced an advisory Guidelines sentencing range of 130 to 162 months' imprisonment. (Tr. 19). He did not, however, ask for a particular sentence, or even a sentence within the advisory Guidelines range; rather, Todd requested "a sentence that is fair and just under the circumstances," asking the Court to "consider [various] factors, along with the revised Sentencing Guidelines range." (Docket Entry 621 at 8; *see also*, *id.* at 2 (asking the Court to "impose a fair and just sentence that is consistent with the revised Sentencing Guidelines range and the factors identified in 18 U.S.C. § 3553; Tr. 25 ("our letter asks for a fair and just sentence")). Moreover, Todd relied, in part, on various health conditions—glaucoma, blindness in one eye, tooth pain, a knee injury, and lacerations to his back and arm—as mitigating factors. (Docket Entry 621 at 6–7). Asthma was such a minor concern that it was not raised at all.

Having heard from the parties and Todd himself,[4] the Court sentenced Todd to the statutory maximum sentence of 20 years' imprisonment.[5] While it was an

---

[4] Incredibly, Todd attempted to justify or write off his history of violence, saying that Edward Ramirez, who he had stabbed for being a "rat," "just shot someone in the face." (Tr. 37). In other words, not only had Todd not learned his lesson, but he believes that his violent conduct is appropriate.

[5] The primary fight at sentencing was whether the Court would announce that it intended for the BOP to grant Todd credit for 15 months spent in prison on a violation of the terms of his supervised release. (Tr. 25–26, 31–33). Todd asked the Court not to opine on the issue. (Tr. 25–26). The Court agreed and declined to state its intentions on the record, deferring to BOP to calculate Todd's sentence. (Tr. 26, 32, 42–43).

above-Guidelines sentence, the Court explained its reasons in detail. Among other things, the Court had already explained that, had it "known at the time [it] sentenced him [to 22 years' imprisonment] what the next eight years were going to include [Todd's continuous violent behavior while incarcerated], I would have given him a much bigger sentence." (Tr. 24). The Court considered the victims who Todd traumatized: "I think a lot of these people will never recover from the violent assaults that were perpetrated against them by this robbery conspiracy, of which you were a full-fledged, absolute, fully engaged member." (Tr. 40). The Court continued to discuss why Todd's acts were not only reprehensible on their own, but demonstrated his incorrigibility:

> I don't want to repeat everything I said last time, but this was a brutal string of crimes that had real effects on real people, and you committed that crime while you were on supervised release. You committed that conspiracy, which involved multiple additional robberies, after you had previously been convicted of a serious crime in Federal Court.
>
> * * *
>
> [T]he Supreme Court has presented you with a windfall. I agree with what Mr. Maimin said. I mean, this is a very technical ruling from the Supreme Court that has the effect of wiping away the second count of your conviction, but it doesn't really change anything that you did. It doesn't really change what the crime was about.
>
> It has minimal impact on the guidelines here, but the fact is that I wasn't allowing the guidelines to drive this sentence last time. I considered the guidelines, but I ultimately concluded that the guidelines just didn't do justice to the violence that was perpetrated here by people who really preyed on victims who were simply trying to go about their business. And you had multiple opportunities to turn it around and to stop. So that's really what drove the sentence, and I thought 22 years was appropriate.

I can't give you more than 20 years now. I certainly can't give you 22 years, but it does seem to me that between the day of your guilty plea and today, you have a pretty bad record. You've got the incident in which you stabbed Ramirez while you were [a]waiting sentencing. You've got multiple infractions, which others don't have.

You've endeavored to explain to me why or how that came about. You know, I'm not there. I don't know. I wasn't a witness, but I have to say that I've not seen anything like your record since I sentenced you. And it doesn't suggest to me that you are somebody who's amenable to complying with lawful directives of prison officials or supervised release officials in the probation department. It seems to me that you're dangerous. You're as dangerous today as the day that I sentenced you.

So I am serious when I say that if I could sentence you to more than 20 years, I would. And it's not to say that I don't credit some of the things you're doing. The fact that you are endeavoring to maintain a relationship with your son, I think is to your credit. The fact that you're trying to take some programming is to your credit, but I have to say others in your situation have done much more than you have, without anything approaching the infractions that you have.

\* \* \*

With all the data that I now have, recognizing that you and [co-defendant Shea] Douglas and everybody evolves over time, it seems you have not evolved the way that one would have hoped. You have maintained destructive behaviors that existed for far too long, from the date of the sentencing that I originally imposed.

(Tr. 40–42).

6

Todd filed a timely notice of appeal; his appeal is still pending. (Docket Entry 630). According to the BOP website, Todd's current expected release date is January 19, 2030. [6]

## C.    Todd's Health Conditions

At the time of his sentencing, Todd reported a number of health conditions, including glaucoma, a lazy eye, a herniated disc, asthma, and tendinitis of his elbows. (PSR ¶ 117). His asthma was mentioned only in passing. (PSR ¶ 117). Asthma has not been an issue since he was incarcerated.[7] At his chronic care visit[8] on November 20, 2018, Todd reported that "he has had no severe asthma exacerbations in the past 3 years." (MR2 25). Indeed, the doctor had only asked about the last three years; at Todd's 14-day physician evaluation[9] on October 31, 2018, Todd reported that his "last

---

[6] Todd has lost an awful lot of good-time credit due to his non-stop series of violent and other infractions while incarcerated; that date will likely extend outward as his behavior continues.

[7] The Government is providing Todd's BOP medical records to this Court (and defense counsel) under seal, as it details his entire medical history, which is not appropriate for public dissemination. As the Court can imagine, because Todd has been in prison a substantial period of time, his medical records are voluminous, and are therefore provided to the Court in a number of electronic files, all in .pdf format. References to those files will be to the file names—*i.e.*, "MR1" refers to the file titled MR1.pdf—and the page references will be to the .pdf page numbers.

[8] Chronic care visits are not triggered by any medical events. Rather, under BOP guidelines, "Chronic Care Clinics (CCCs) are a means for inmates with ongoing medical needs to be tracked and seen by a health care provider at clinically appropriate intervals. A physician will see all inmates assigned to a CCC every 12 months, or more often if clinically indicated." BOP Program Statement 6031.14, § 15 (June 3, 2014).

[9] 14-day physician evaluations are triggered by any medical events. Rather, under BOP guidelines, "For individuals in predictably short-term custody (FDCs/MCCs/ MDCs/Jails), an initial screening physical examination to determine medical needs will

[asthma] attack [was] more than eight years [earlier]; no recent albuterol[10] use …
No history of intubation/hospitalization." (MR2 32).[11] At Todd's most recent chronic
care visit, on February 13, 2020, Todd reaffirmed any symptoms of asthma or "recent
Asthma attack, … wheezing, … [or] any cough." (MR1 7). The results of the medical
exam were all "[w]ithin normal limits." (MR1 7–9; *see also* MR1 13–14 (reporting nor-
mal examination results on November 12, 2019)).[12] Nonetheless, Todd was prescribed
an Albuterol inhaler for use "only as needed." (MR1 14).

In April 2020—after judges started to consider releasing inmates due to
COVID-19—Todd complained twice of respiratory issues; each appears to have been
imagined. In particular, on April 3, 2020, Todd "complained to the officer after the
count that he was having trouble breathing." (MR1 4). However, "he ambulated to the
medical room on the 5th floor in no distress," where the nurse concluded that there
were "No Significant Findings/No Apparent Distress" after finding no" Coughing, se-
vere w production green/brown mucus, Respiratory Distress, [or] Tachypnea."

---

be done **within 14 days of admission** on the appropriate physical examination form."
BOP Program Statement 6031.14, § 19 (June 3, 2014) (emphasis in original).

[10] "Albuterol (also known as salbutamol) is used to prevent and treat wheezing and
shortness of breath caused by breathing problems (such as asthma, chronic obstruc-
tive pulmonary disease). It is also used to prevent asthma brought on by exercise. It
is a quick-relief medication. Albuterol belongs to a class of drugs known as broncho-
dilators. It works in the airways by opening breathing passages and relaxing mus-
cles." *See* https://www.webmd.com/drugs/2/drug-4872-1697/albuterol-sulfate-inhala-
tion/albuterol-salbutamol-breath-activated-inhaler-oral-inhalation/details..

[11] On November 21, 2019, Todd reported that he had been hospitalized and intubated
once: in 1993—27 years ago—when he was a child. (MR1 12).

[12] Todd did report what appears to be sleep apnea. (MR1 7).

(MR1 4). Three days later, on April 7, 2020, Todd told the nurse conducting temperature checks: "I think I have pneumonia every time I breath[e] it hurts I know [because] I have [history] of pneumonia." (MR1 1). The nurse and nurse-practitioner both evaluated Todd and found nothing wrong with him. (MR1 1).

### D.    The BOP and COVID-19

The BOP in has acted to curb the spread of COVID-19. To be sure, the COVID-19 pandemic warrants serious attention. But Todd has offered no evidence to suggest the BOP is not taking the pandemic seriously. To the contrary, the BOP has made significant efforts to respond. In particular, since at least October 2012, the BOP has had a Pandemic Influenza Plan in place. *See* BOP Health Management Resources.[13] Moreover, beginning over three months ago, in January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* Federal Bureau of Prisons COVID-19 Action Plan.[14] As part of its Phase One response to COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, the BOP stood up "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease

---

[13] Available at https://www.bop.gov/resources/health_care_mngmt.jsp

[14] Available at https://www.bop.gov/resources/news/20200313_covid-19.jsp

Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. The BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On March 13, 2020, the BOP, after coordination with DOJ and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* These national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, the BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* In addition, the BOP implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of the BOP's inmate screening process, (i) "[a]ll

newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

That did not end the BOP's response. On March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. *See* BOP Update on COVID-19.[15] On March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as

---

[15] Available at https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

meeting CDC criteria for release from isolation. *See* BOP COVID-19 Action Plan: Phase Five.[16]

On April 1, 2020, the BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service (the "USMS:") to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access. *Id.*

BOP continues to operate under modified conditions, including suspension of social visits and inmate movements (with limited exceptions where special procedures are followed to prevent the spread of COVID-19), continuous screening of inmates, and other modified operations designed to maximize social distancing. *See* BOP Implementing Modified Operations.[17] In particular, BOP ordered the extension of the April 1, 2020, plan through at least May 18, 2020. *See* Letter from BOP to the

---

[16]   Available   at   https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

[17] Available at https://www.bop.gov/coronavirus/covid19_status.jsp.

Honorable Roslynn R. Mauskopf, Chief United States District Judge, Eastern District of New York, dated April 21, 2020.[18]

These measures have proved quite successful. As of today, the Metropolitan Detention Center Brooklyn (the "MDC")—where Todd is housed—reported a total of twelve inmates who presented symptoms that required testing, *six* of whom tested positive for COVID-19. *See* Letter from BOP to the Honorable Roslynn R. Mauskopf, Chief United States District Judge, Eastern District of New York, dated April 21, 2020. The MDC houses 1,734 total inmates. *See* BOP website for MDC Brooklyn.[19] That means that 0.35% of MDC inmates have been confirmed to have COVID-19. By way of contrast, New York City had an estimated population of 8,398,748 as of July 2018. *See* U.S. Census Population Forecast.[20] As of this morning, 136,816 cases of COVID-19 had been diagnosed in New York City. *See* New York Times, Coronavirus in the U.S., Latest Map and Case Count.[21] That means that 1.63% of the New York City population has been diagnosed with COVID-19. In other words confirmed cases of COVID-19 are nearly five times as prevalent in New York City in general as they are in the MDC.

---

[18] The BOP's bi-weekly updates on the progress of COVID-19 at the MDC are available at https://www.nyed.uscourts.gov/coronavirus.

[19] Available at https://www.bop.gov/locations/institutions/bro/.

[20] Available at https://www.census.gov/quickfacts/newyorkcitynewyork.

[21] Available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#states; last viewed on April 21, 2020, at 1:20 p.m.

All of these steps belie any suggestion that BOP is failing to meaningfully address the risks posed by COVID-19 or take seriously the threat the pandemic poses to current inmates. Indeed, Todd recites the number of BOP inmates throughout the country with confirmed cases of COVID-19: he says 446 as of April 14, 2020, though it has grown by 11.4% in the week since to 497.[22] (Motion 2). He fails to mention that there are a total of 153,930 inmates in BOP facilities (including community-based facilities, which also factor into the COVID-19 numbers).[23] That means that across all BOP facilities, and not just the MDC, the confirmed COVID-19 infection rate is 0.32%, or five times less than New York City. To the contrary, the facts show that the BOP has taken the threat very seriously, and has mitigated it to an extraordinary degree.

## III. Argument

This Court cannot grant bail pending appeal because he fails to qualify for it on a number of bases, any one of which disqualifies him from release.

### A. Applicable Law

Congress made clear its view that, "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances." *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess.,

---

[22] *See* https://www.bop.gov/coronavirus/.

[23] *See* https://www.bop.gov/coronavirus/.

at 186–87 (1970)). Rather, following a guilty verdict and sentencing, there is a "pre-sumption in favor of detention." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). A defendant bears the burden of "rebut[ting] that presumption with clear and convincing evidence …." *Id.* That policy is codified within the Bail Reform Act. *See* 18 U.S.C. § 3143(b).

Consistent with that congressional purpose, the Bail Reform Act provides that a court "shall order that a person who has been found guilty of an offense and sen-tenced to a term of imprisonment" be detained pending appeal, unless the court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released," "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in … (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1).

The Bail Reform Act further provides, however, irrespective of Sec-tion 3143(b)(1), that a court "shall order that a person who has been found guilty" of certain specified offenses "and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained." 18 U.S.C. § 3143(b)(2). These offenses include crimes of violence. 18 U.S.C. §§ 3142(f)(1)((A),

15

3143(b)(2), 3156(a)(4)(B).[24] Todd appears to concede that his Hobbs Act robbery conspiracy conviction is a crime of violence. (Motion 1).

Nevertheless, in certain limited circumstances, a defendant properly "subject to detention" pursuant to Section 3143(b)(2) "who meets the conditions of release" required under Section 3143(b)(1) "may be ordered released, under appropriate conditions … if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. § 3145(c). "Exceptional circumstances exist where there is a unique combination of circumstances giving rise to situations that are out of the ordinary." *United States v. Lea*, 360 F.3d 401, 403 (2d Cir. 2004) (quoting *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir. 1991)).

Accordingly, in order to qualify for bail pending appeal, a defendant such as Todd must demonstrate:

(1)   "by clear and convincing evidence that [he] is not likely to … pose a danger to the safety of any other person or the community if released," 18 U.S.C. § 3142(b)(1)(A);

(2)   "by clear and convincing evidence that [he] is not likely to flee … if released," 18 U.S.C. § 3142(b)(1)(A);

(3)   that his appeal "raises a substantial question of law or fact," 18 U.S.C. § 3142(b)(1)(B);

---

[24] A "crime of violence" under the Bail Reform Act includes "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 3156(a)(4)(B). This "residual clause" survived *Davis*. *See United States v. Watkins*, 940 F.3d 152, 159–61 (2d Cir. 2019).

(4)    that his appeal is likely to result in either "reversal," "a sentence that does not include a term of imprisonment" or "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process," 18 U.S.C. § 3142(b)(1)(B)(iii)&(iv); and

(5)    "clearly … that there are exceptional reasons why [his] detention would not be appropriate," 18 U.S.C. § 3145(c).

If a defendant fails to meet any one of these conditions, the Court cannot grant him bail.

## B.  Discussion

Todd cannot meet *any* of the five predicate conditions for bail pending appeal, much less all five of them. Indeed, the Court made clear that Todd could not even surmount the very first condition—that he demonstrate "by clear and convincing evidence that [he] is not likely to … pose a danger to the safety of any other person or the community if released," 18 U.S.C. § 3142(b)(1)(A)—when it explained, accurately, that Todd is not "somebody who's amenable to complying with lawful directives of prison officials or supervised release officials in the probation department. It seems to me that you're dangerous. You're as dangerous today as the day that I sentenced you." (Tr. 41).

### 1. Todd Cannot Demonstrate, by Clear and Convincing Evidence, That He "Is Not Likely To … Pose a Danger to the Safety of Any Other Person or the Community if Released"

Todd is a menace. He has demonstrated that, among those who are unable to control Todd's violent impulses are: (1) Todd's girlfriend, who mothered his child;[25] (2) Todd's mother;[26] (3) the United States Probation Department;[27] and the BOP.[28] Also unable to control Todd's violent impulses? Todd himself. Todd told this Court, in 2013:

> I would like to begin by acknowledging my wrongdoings. I recognize that I made many bad decisions in my life, whether it be with what occupation I had or the company I found myself around. Ultimately, every mistake I made in this life, has led to a lesson. This time in my life has been extremely trying, but I have come to the conclusion that the hardest part of knowing something is the learning process. With that being said, I know that I have promised to avoid bad choices in the future and that I am truly learning my lesson.

---

[25] Todd was living with his girlfriend when he engaged in the violent Hobbs Act robbery conspiracy. (PSR ¶ 113).

[26] Todd's child was living with Todd's mother when he engaged in the violent Hobbs Act robbery conspiracy. (PSR ¶ 113). Todd admitted that his mother "tried to keep him out of trouble." (PSR ¶ 112). Apparently, she was not successful.

[27] Todd repeatedly violated the terms of his supervised release, including by engaging in the violent Hobbs Act robbery conspiracy.

[28] While incarcerated from 2012 through today, Todd engaged in at least 14 violent or weapons-related incidents, including stabbing Edward Ramirez for being a "rat." (Docket Entry 622 at 11–13, 20–21). During his prior, much shorter, stay in BOP facilities, Todd was involved in another seven violent or weapons-related incidents. (Docket Entry 622 at 21 n.14).

(Tr. 27 (quoting Todd's 2013 sentencing)). Todd then continued to engage in an extraordinary pattern of continued violence while incarcerated after that speech. (Docket Entry 622 at 11–13, 20–21).

As a result of this history, the Court found that Todd is not "somebody who's amenable to complying with lawful directives of prison officials or supervised release officials in the probation department. It seems to me that you're dangerous. You're as dangerous today as the day that I sentenced you." (Tr. 41).

In response, Todd offers no evidence, much less clear and convincing evidence, that his danger to the community could be ameliorated, presumably for the first time in his life. Rather, he simply asserts, as *ipse dixit*, that "Mr. Todd would abide by any conditions of release that this Court imposes and, given the strict conditions of home confinement and electronic monitoring that he would be subject to, Mr. Todd would pose no future danger to the safety of others or the community." (Motion 5). If this assertion were sufficient, this important requirement would be, in effect, dead letter, as it would be satisfied by any defendant's mere assertion that it is satisfied.

In short, Todd's mere assertion that this Court should simply trust him, in spite of mountains of evidence of Todd's continued danger to all those around him, does not suffice to establish clear and convincing evidence that he will not pose a danger to others if released.

### 2.   Todd Cannot Demonstrate, by Clear and Convincing Evidence, That He "Is Not Likely to Flee … if Released"

This Court sentenced Todd to 20 years' imprisonment. He has at least approximately ten years to go, although that will likely increase if he continues to act out

19

while in prison, losing yet more good-time credit. That is an extremely strong incentive for Todd to flee. The primary disincentive would, presumably, be the threat of sanction from this Court. (Motion 5). Except that threat has failed to deter Todd in the past, including when he was on supervised release.

Todd therefore appeals to the influence of his "supportive family, close ties to the community, and an abiding commitment to his son, who lives in New York City." (Motion 5). Each of these rings hollow. Todd's "supportive family" failed to constrain Todd from committing extraordinary violent acts in the past, even while on supervised release. It is hard to believe that Todd has "close ties to the community," considering that, for more than 16 years—since his arrest in his first federal case on January 26, 2004 (PSR ¶ 103)—Todd has spent slightly over two years in "the community," the rest of his time being in federal lock-up. Finally, despite Todd's "abiding commitment to his son, who lives in New York City," upon which Todd relied at his various sentencings, Todd's repeated actions while in custody, which significantly lengthened the time before he gets released to see his son (who lived with Todd's mother, and not Todd, before his most recent arrest) undercuts this argument. Indeed, if Todd remains in prison—as he should—he will not get to see his son as a free man until his son is at least 19 years old, yet another reason for Todd to flee.

In short, Todd's assurance that this Court should just trust him, despite his repeated violation of the Court's trust in the past, does not suffice as clear and convincing evidence that he will not flee.

### 3.   Todd's Appeal Does Not "Raise[] a Substantial Question Of Law or Fact"

Section 3143's "substantial" question requirement reflects the principle that "[a]n imprisoned person is not to be released pending further proceedings if it is a certainty that however those proceedings are resolved, he will have to be returned to prison." *United States v. LaGiglio*, 384 F.3d 925, 926 (7th Cir. 2004); *see also United States v. Manson*, 788 F. App'x 30, 33 (2d Cir. 2019) (denying bail pending resolution of habeas petition because "succeeding on this habeas petition does not mean [petitioner] should never have been convicted or could not have been incarcerated beyond a certain length of time," but rather "[i]t just means that the District Court will resentence him with the benefit of the purportedly correct Guidelines range of 15 to 21 months" and "there is no guarantee that the District Court will reduce his sentence to within that range"); *United States v. Krilich*, 178 F.3d 859, 861–62 (7th Cir. 1999) (discussing purposes of bail pending appeal); *United States v. Randell*, 761 F.2d 122, 125–26 (2d Cir. 1985) (bail pending appeal not warranted where question presented was not "substantial" with respect to at least some of the counts forming basis of prison sentence). Todd's argument ignores that principle.

As this Court has explained:

> A substantial question is "'a "close" question or one that very well could be decided the other way.'" *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)). "If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.' "

> *Id.* (quoting *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)). At each of these steps, the defendant bears the burden of persuasion. *Id.*

*United States v. Newman*, No. 12 Cr. 121 (RJS), 2013 WL 1943342, at *1 (S.D.N.Y. May 7, 2013) (Sullivan, *J.*). Here, Todd has failed to identify *any* question of fact that he plans to raise on appeal, and only argues, as a question of law, that "[t]he question of whether this [20-year] sentence was so high as to be 'substantively unreasonable,' … could 'very well could be decided the other way.'" (Motion 5 (quoting *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2020); *Randell*, 761 F.2d at 125)). Todd does not explain why this sentence—admittedly, an above-Guidelines sentence—"could very well be decided" to be "substantively unreasonable," especially in light of the Second Circuit's edict that a defendant arguing substantive unreasonableness "bears a heavy burden because [appellate] review of a sentence for substantive reasonableness is particularly deferential." *Broxmeyer*, 699 F.3d at 289. Nor does Todd explain why the Second Circuit would take the extremely unusual step of "substitut[ing its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," or why this is the "exceptional case where the trial court's decision cannot be located within the range of permissible decisions," so that the Circuit should "set aside a district court's substantive determination." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (emphasis and quotation marks omitted). Indeed, in light of this Court's careful, and detailed, consideration of the Section 3553(a) factors, as well as the facts presented at sentencing—not to mention the fact that Todd did not even appeal the substantive reasonableness of his prior 22-year above-Guidelines sentence, imposed before the Court

knew of the subsequent conduct that cause the Court to opine that, had it known what Todd would do while in prison, it "would have given him a much bigger sentence" (Tr. 24)—there is no real chance that the Second Circuit will find Todd's 20-year sentence to be substantively unreasonable, much less that it would do so in a way that resulted in Todd's release.

Instead, Todd simply concludes, without analysis, that "the question presented by Mr. Todd's appeal is 'fairly debatable' and 'not frivolous.'" (Motion 6 (quoting *Randall*, 761 F.2d at 125). Todd mis-cites *Randell*. In *Randell*, the Second Circuit considered three different definitions of a "substantial question":

> The *Miller* court defined a substantial question as "one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." 753 F.2d at 23. *Giancola* held that a substantial question "is one of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." 754 F.2d at 901. *Handy* defined substantial as "fairly debatable." 753 F.2d at 1490.[] We do not believe that these definitions of "substantial" differ significantly from each other, but if we were to adopt only one, it would be the language of *Giancola*.

*Randell*, 761 F.2d at 125 (quoting *Miller*, 753 F.2d 19; *Giancola*, 754 F.2d 898; *United States v. Handy*, 753 F.2d 1489 (9th Cir. 1985)). It is clear, therefore, that a question not being "frivolous" is not enough to make it a substantial question. Todd's argument on appeal is not a "'close' question or one that very well could be decided the other way." *Randell*, 761 F.2d at 125 (quoting *Giancola*, 754 F.2d at 901)).

In short, when this Court announced a 20-year sentence—explaining, in detail, that it only did so because it was bound by the statutory maximum and would have preferred to impose a greater sentence (Tr. 42)—it did not impose a substantively

unreasonable sentence, and this is not the "exceptional" case in which the Second Circuit will find otherwise.

> **4.** **Todd's Appeal Is Not Likely to Result in Either "Reversal," "a Sentence That Does Not Include a Term of Imprisonment," or "a Reduced Sentence to a Term of Imprisonment Less Than the Total of the Time Already Served Plus The Expected Duration of the Appeal Process"**

To meet his burden, Todd must establish not only that the question presented is "substantial," but also that his appeal is likely to result in: "(i) reversal, (ii) an order for a new trial,[29] (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B). Todd does not meet that standard because, not only is there no material chance that Todd prevails on appeal, but, if he did, there is no real chance that this Court would reduce his sentence either to probation or so dramatically that Todd might complete his sentence during the pendency of his appeal. 18 U.S.C. § 3143(b)(1)(B)(iii)&(iv).

Todd attempts to avoid the consequences of his failure by suggesting it is sufficient that his argument will result in the "reversal" of this Court's sentence, regardless of the impact on that sentence. (Motion 5). He is mistaken.

Todd's's argument misunderstands the difference between "reversal" and "vacatur." *See* Hon. Jon O. Newman, *Decretal Language: Last Words of An Appellate*

---

[29] Todd pleaded guilty, so Section 3143(b)(1)(B)(ii) is inapplicable here.

*Opinion*, 70 Brook. L. Rev. 727, 728–29, 732 (2005). Ordinarily, where a district court errs in determining the sentence, the Second Circuit "vacates" the sentence and/or remands for resentencing; it does not "reverse." *Id.*; *see also, e.g.*, *United States v. McDowell*, — F. App'x —, Docket No. 19-899, 2020 WL 1228766, at *2 (2d Cir. Mar. 13, 2020); *Baldwin v. United States*, 778 F. App'x 42, 43 (2d Cir. 2019); *United States v. Valente*, 915 F.3d 916, 925 (2d Cir. 2019). Thus, Todd is not likely to obtain a "reversal," even if he were right on the merits.

The text and history of Section 3143 also belie Todd's claim. Prior to 1988, bail pending appeal could be obtained where the defendant presented a substantial question likely to result in "reversal, an order for a new trial, or a sentence that does not include a term of imprisonment." Pub. Law 98-473, 98 Stat. 1837 (Oct. 12, 1984), *as amended by*, Pub. Law 99-646, §§ 51, 55, 100 Stat. 3605, 3607, 3609 (Nov. 10, 1986). In 1988, Section 3143 was amended to add the scenario now contained in Section 3143(b)(1)(B)(iv)—that the question presented is likely to result in "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." Pub. Law 100-690, 102 Stat. 4181 (Nov. 18, 1988).[30] The legislative history makes clear that this amendment was necessary because the statute's prior language did not cover that scenario. *E.g.*, 134 Cong. Rec. S17360-02, 1988 WL 182529. Todd's argument that it is sufficient to obtain "reversal" of a legal determination made at sentencing, *even if* it will not result in a sentence of

---

[30] Interestingly, Todd relies on a pre-1988-amendment case for his argument. (Motion 5 (quoting *Randell*, 761 F.2d at 124)).

less than time served plus the duration of the appeal process, would render Section 3143(b)(1)(B)(iv) superfluous.

In short, there is no chance that, at the end of the appeal, Todd gets either no prison time or so little time that it will already have been served. And Todd is simply appealing the substantive reasonableness of his sentence (Motion 5), so reversal of his conviction is not in the cards.

### 5.   Todd Cannot "Clearly Show[] That There Are Exceptional Reasons Why [His] Detention Would Not Be Appropriate"

COVID-19 is a serious issue. Todd has some history of asthma, which, out of context, might increase the risks to him if he were infected.[31] However, Todd's history is not a severe one by any means. He was last hospitalized—possibly, though not clearly, for asthma—27 years ago (MR1 12; MR2 32), and has not had an asthma attack in at least nine years (MR2 32). He has been prescribed an Albuterol inhaler, but only for use "as needed," and not regularly. (MR1 14). Every time he has been

---

[31] Todd correctly states that, "According to the CDC, an asthmatic person is at higher risk of getting very sick from COVID-19, which lead to acute respiratory disease and death." (Motion 3 (citing https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html)). Because of the novelty of COVID-19, however, there has not been extensive research into the risk factors, and so it is not so cut-and-dry. For example, Dr. Nilam Mangalmurti of the Hospital of the University of Pennsylvania (the "HUP") explained to Science Magazine that it appears that vascular issues may present more significant risk factors than respiratory issues such as asthma: "Mangalmurti says she has been 'shocked by the fact that we don't have a huge number of asthmatics' or patients with other respiratory diseases in HUP's ICU. 'It's very striking to us that risk factors seem to be vascular: diabetes, obesity, age, hypertension.'" Meredith Wadman, Jennifer Couzin-Frankel, Jocelyn Kaiser, and Catherine Matacic, "How does coronavirus kill? Clinicians trace a ferocious rampage through the body, from brain to toes," *Science Magazine*, https://www.science-mag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes (Apr. 17, 2020).

examined, medical professionals have found no respiratory problems. The sole exception seems to be since his fellow inmates began seeking bail and compassionate release: in April he twice presented himself as having his own respiratory problems; each time, he was examined and nurses could find nothing. (MR1 1–4).

As the Honorable Robert N. Scola, Jr., United States District Judge, explained in denying an asthmatic defendant's motion for bail pending appeal:

> The only additional ground for his current release is the COVID-19 pandemic and Esformes's claim of a pre-existing condition which makes him more vulnerable to the virus. As the government points out in its response, Esformes's asthma is not at an acute level warranting his release after serving less than 25% of his sentence. Virtually every person over the age of 50 has some health condition that could conceivably put that person at a greater risk of succumbing to the coronavirus, but this does not entitle every inmate over 50 to be released. Attorney General William Barr's memo urging the release of particularly vulnerable inmates is not a get-out-of-jail-free card for every incarcerated person.

*United States v. Esformes*, No. 16 Cr. 20549 (RNS), Docket Entry 1491 at 2 (S.D. Fla. Apr. 9, 2020). Here, Todd seeks to use his pre-existing condition—apparently incredibly mild historical asthma—as a basis to leave a facility that has regulations and procedures in place to minimize the spread of COVID-19 virus (and has successfully done so thus far)—and go into a community where there is no reason to believe he would be safer. In Judge Scola's words, he seeks to use his diagnosis of asthma as a "get-out-of-jail-free card."

In short, Todd presents no basis to believe that his history of asthma—which has not manifested itself to his detriment in years and years—presents such an exceptional risk that the only way to ameliorate it would be to release him. Indeed, the

continued danger to the community from Todd far outweighs any speculative danger

to Todd from remaining incarcerated.

## IV.  Conclusion

For the reasons stated above, the Court should deny Todd's Motion.

Dated:      New York, New York
            April 21, 2020

                                    Respectfully submitted,

                                    GEOFFREY S. BERMAN
                                    United States Attorney for the
                                    Southern District of New York

                        By:     _____
                                    Michael D. Maimin
                                    Assistant United States Attorney
                                    Tel: (914) 993-1952